IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Indemnity Insurance Company of North : 
America, :
                Petitioner :
                          :
              v. : No. 696 C.D. 2018
                          : Argued: June 10, 2020
Bureau of Workers' Compensation Fee :
Review Hearing Office (Insight :
Pharmacy), :
              Respondent :

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge
                HONORABLE J. ANDREW CROMPTON, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT[1]            FILED: January 5, 2021

        Indemnity Insurance Company of North America (Insurer) petitions for review of an adjudication of the Bureau of Workers' Compensation Fee Review Hearing Office (Hearing Office) that Insurer owed Insight Pharmacy (Pharmacy) $6,336.02, plus interest, for a compounded medical cream Pharmacy dispensed to Jessica Breidenbach (Claimant). In doing so, the Hearing Office affirmed the determination of the Medical Fee Review Section of the Bureau of Workers' Compensation (Bureau). On appeal, Insurer argues that the Hearing Office erred because it used a nationally recognized schedule of average wholesale

---

[1] This case was assigned to the opinion writer before January 4, 2021, when President Judge Leavitt served as President Judge.

pharmaceutical prices, which Insurer describes as a "fictitious" number, to calculate the amount of the reimbursement owed by Insurer to Pharmacy. Insurer also challenges the regulation that authorizes the use of a nationally recognized schedule of average wholesale prices to reprice provider invoices for pharmaceutical prescriptions. For the reasons that follow, we affirm.

## Background

In 2013, Claimant sustained a work-related back injury and began treatment with David Lichten, M.D., who prescribed a compounded medical cream to treat her pain. Pharmacy dispensed the cream to Claimant and billed Insurer $7,255.75. The invoice itemized the costs as follows: (1) gabapentin - $2,595.53; (2) flurbiprofen - $1,580.25; (3) ketamine - $1,447.88; (4) cyclobenzaprine - $654.22; (5) lipoderm base - $634.61; and (6) bupivacaine - $343.26. The invoice also included the following information:

- Dates of service
- Date of injury
- Prescribing physician
- Names of the drugs/medications
- [National Drug Code (NDC)] numbers for all components of the medication
- Prescription number

Reproduced Record at 42a (R.R. ___).

On December 9, 2016, Insurer's third-party administrator, Gallagher Bassett Services, Inc., reduced the invoice by 95.5% with the following explanation:

> Unless otherwise noted, charges were reduced as they exceed the guidelines set forth in the Pennsylvania Workers' Compensation Law.

R.R. 44a. Insurer paid $305.92 on Pharmacy's invoice.

2

Pharmacy filed an application for a fee review of the amount and timeliness of Insurer's payment. The Medical Fee Review Section ordered Insurer to pay Pharmacy an additional $6,336.02, with interest, explaining as follows:

> Per Section 127.131[, 34 Pa. Code §127.131,] Reimbursement for all unlisted or unclassified drugs under Act 44[2] shall be 110% of the average wholesale price (AWP).

R.R. 54a.

Insurer requested a hearing to contest the fee review determination. In support, Insurer offered an affidavit from Julia Leonard, a medical invoice processor for Genex Services, Inc.[3] The affidavit stated, in pertinent part, as follows:

> 3. [Insurer] received a bill from [Pharmacy] on December 2, 2016[.] The bill was for date of service November 21, 2016 and sought payment of $342.26 for 7.20 units of "Bupivacaine Hcl Powder." []
>
> 4. Genex Services re-priced this bill at a rate of 110% of [AWP]. The Average Wholesale [Price] for 7.20 units of Bupivacain[e] Hcl Powder was calculated to be $305.92, as determined via review of the NDC 51927235800 at the [Red Book] value of $39.73. Genex Services thereafter recommended to [Insurer] an allowance of $305.92 for the bill.

Leonard Affidavit at 1; R.R. 37a. Insurer also submitted the following excerpt from the Truven Health Analytics policy:

> The Average Wholesale Price (AWP) as published by Truven Health Analytics is in most cases the manufacturer's[] suggested AWP and does not reflect the *actual* AWP charged by a

---

[2] Act of July 2, 1993, P.L. 190, No. 44, commonly referred to as Act 44.

[3] Genex has contracted with Gallagher Bassett, which in turn provides claim adjudication services to Insurer.

wholesaler. Truven Health bases the AWP data it publishes on the following:

- AWP is reported by the manufacturer, **or**

- AWP is calculated based on a markup specified by the manufacturer. This markup is typically based on the Wholesale Acquisition Cost (WAC) or Direct Price (DIRP), as provided by the manufacturer, but may be based on other pricing data provided by the manufacturer, **or**

- Suggested Wholesale Price (SWP) is reported by the manufacturer

When the manufacturer does not provide an AWP, a markup formulated from which AWP can be calculated, or an SWP, Truven Health will calculate the AWP by applying a standard 20% markup over the manufacturer supplied WAC. If a WAC is not provided, the standard markup will be applied to the DIRP.

\*\*\*

R.R. 39a (emphasis in original).

The Hearing Office affirmed the determination of the Medical Fee Review Section that Insurer owed Pharmacy $6,336.02, plus interest. The Hearing Office did not credit Leonard's affidavit for several reasons. It found, specifically, that Leonard's affidavit incorrectly stated the amount of Pharmacy's invoice; addressed only one of five ingredients used to produce the compounded medical cream, *i.e.*, the bupivacaine powder; and contained arithmetic errors. In accordance with these findings, the Hearing Office held that Insurer did not prove by a preponderance of the evidence that it had properly reimbursed Pharmacy for the compounded medical cream.

4

Insurer petitioned for this Court's review. On December 19, 2019, this Court directed the parties to file supplemental briefs to address the following question:

> The Act of October 27, 2014, P.L. 2894, re-wrote Section 306(f.1)(3)(vi)(A) of the Workers' Compensation Act to limit reimbursement for pharmaceutical goods and services to 110% "of the average wholesale price (AWP) of the product, <u>calculated on a per unit basis, as of the date of dispensing</u>." 77 P.S. §531 (added language emphasized). The language was added to the statute after extensive nationwide litigation questioning the accuracy of the AWP value. How, if at all, should this amendment impact statutory construction of the undefined term "average wholesale price (AWP) of the product"?

Order, 12/19/2019 (emphasis in original). In their supplemental briefs, both parties took the position that the 2014 amendment to Section 306(f.1)(3)(vi)(A) did not alter the meaning of the term "Average Wholesale Price."[4]

## Appeal

On appeal,[5] Insurer raises three issues. First, Insurer argues that the Hearing Office erred by using a "fictitious" AWP set forth in a trade publication and not the "actual" AWP to determine the repriced amount of Pharmacy's invoice. Second, Insurer argues that the Bureau's medical cost containment regulation

---

[4] In its supplemental brief, Insurer contends that "the legislature did not intend to alter the meaning of the term 'Average Wholesale Price'" in enacting the changes to Section 306(f.1)(3)(vi)(A). Insurer Supplemental Brief at 4. It argues that the legislature meant for the term "Average Wholesale Price" to "be understood according to its plain meaning." *Id.* Similarly, Pharmacy contends that Section 306(f.1)(3)(vi)(A), both before and after the 2014 amendment, requires the reimbursement rate for drugs and services to be 110% of the AWP. Pharmacy Brief at 7.

[5] This Court's review of the Hearing Office's adjudication considers whether necessary findings of fact are supported by substantial evidence, whether constitutional rights were violated, and whether the Hearing Office erred as a matter of law. *Walsh v. Bureau of Workers' Compensation Fee Review Hearing Office (Traveler's Insurance Company)*, 67 A.3d 117, 120 n.5 (Pa. Cmwlth. 2013).

5

contravenes the relevant provisions of the Workers' Compensation Act (Act).[6] Third, Insurer argues that the General Assembly has unconstitutionally delegated its legislative authority on the repricing of pharmaceutical prescriptions to Truven Health Analytics, a private company. We address these issues *seriately*.

## Analysis

## Act 44 and Its Implementing Regulation

In 1993, the General Assembly enacted Act 44 to establish measures to contain the spiraling cost of medical treatment of work injuries. Act 44 added Section 306(f.1)(3)(vi)(A) to the Act, which presently states as follows:

> The reimbursement for drugs and professional pharmaceutical services shall be limited to one hundred ten per centum of the average wholesale price (AWP) of the product, calculated on a per unit basis, as of the date of dispensing.

77 P.S. §531(3)(vi)(A). Although Act 44 does not define AWP, the Bureau has promulgated a regulation to address this point, and it states as follows:

> (a) Payments for prescription drugs and professional pharmaceutical services shall be limited to 110% of the average wholesale price (AWP) of the product.
>
> (b) Pharmacists and insurers may reach agreements on which Nationally recognized schedule shall be used to define the AWP of prescription drugs. *The Bureau in resolving payment disputes, may use any of the Nationally recognized schedules to determine the AWP of prescription drugs. The Bureau will provide information by an annual notice in the Pennsylvania Bulletin as to which of the Nationally recognized schedules it is using to determine the AWP of prescription drugs.*
>
> (c) Pharmacists may not bill, or otherwise hold the employe liable, for the difference between the actual charge for the

---

[6] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4, 2501-2710.

6

> prescription drugs and pharmaceutical services and 110% of the AWP of the product.

34 Pa. Code §127.131 (emphasis added). The Bureau's most recent notice on which "Nationally recognized" schedule it uses states as follows:

> Under 34 Pa. Code §127.131(b) (relating to payments for prescription drugs and pharmaceuticals – generally), the Department of Labor and Industry, Bureau of Workers' Compensation, gives notice that it utilizes the *Red Book*, published by Truven Health Analytics, to determine the average wholesale price of prescription drugs.

47 Pa. B. 5740 (September 9, 2017).

## I.

In its first issue, Insurer contends that the Hearing Office erred in using a "fictitious" AWP to reprice Pharmacy's invoice. Insurer argues that Truven Health Analytics, and the two other Nationally recognized schedules,[7] do not report the actual AWP. Rather, Insurer contends that these Nationally recognized schedules "use secret, amorphous, and confusing criteria and formulae to derive an entirely [fictitious] AWP." Insurer Brief at 20.

In a payment dispute, it is the burden of the insurer to establish by a preponderance of evidence that it has properly reimbursed the provider. *Liberty Mutual Insurance Company v. Bureau of Workers' Compensation*, *Fee Review Hearing Office (Kepko)*, 37 A.3d 1264, 1269 n.11 (Pa. Cmwlth. 2012). To support its position that it had properly reimbursed Pharmacy, Insurer offered Leonard's affidavit, which stated that Insurer owed Pharmacy $305.92 for 7.20 units of bupivacaine powder on Pharmacy's invoice of $7,255.75. Before the Hearing

---

[7] Those sources are First DataBank and Medispan. Insurer Brief at 19 n.5. Insurer asserts that First DataBank, however, no longer reports on AWP. *Id*.

7

Office, Insurer asserted that $305.92 exceeded "the [actual] AWP and [was] more than the average retail price of the ingredients" in the compounded medical cream. Adjudication at 5, Finding of Fact (F.F.) No. 15; R.R. 103a.

The Hearing Office rejected the Leonard affidavit as having no credibility or evidentiary weight. First, the calculations used therein lacked a foundation. The affidavit proposed a unit price of $39.73 for the bupivacaine powder, but it offered no evidence to support that price or that it was the correct unit price as of "the date of dispensing." *See* 306(f.1)(3)(vi)(A) of the Act, 77 P.S. §531(3)(vi)(A). Second, even assuming that the Leonard affidavit used the correct unit price for the bupivacaine powder as of the date of dispensing, $39.73 multiplied by 7.2 units multiplied by 110% yields a payment amount of $314.66, not $305.92. This omission and concomitant math error rendered the Leonard affidavit incredible and entitled to no weight, in the view of the Hearing Office.

The Hearing Office next observed that although Insurer advocated for the use of the "actual" AWP, rather than a "fictitious" AWP, Insurer offered no evidence on this point. The Leonard affidavit made the conclusory and unfounded claim that Insurer's payment of $305.92 exceeded the actual AWP of the ingredients in the compounded medical cream. However, the affidavit did not identify its source for this claim, and it did not explain why using the "actual" AWP limited the inquiry to only one and not all of the ingredients used in the compounded medical cream dispensed by Pharmacy.

In its brief to this Court, Insurer repeats these claims. It also states that another one of the ingredients in the compounded medical cream, gabapentin, has

an average retail price of $35 for 90 pills.[8] Insurer Brief at 36-37. Insurer then states that the AWP for gabapentin is $140 per bottle, *i.e.*, higher than the retail price. Stated otherwise, Insurer contends that the use of a "fictitious" AWP allowed Pharmacy to charge $2,595.53 for 36 units of gabapentin. However, the amount of gabapentin used in the compounded medical cream has a total retail price of $39.00 by Insurer's calculation. It follows, according to Insurer, that its payment to Pharmacy of $305.92, exceeded the average retail price for the ingredients.

Insurer's argument lacks any support in the record certified to this Court. The Leonard affidavit did not address gabapentin or state the average retail price for a bottle of this medication in pill form. Nor did it state that pills could be used to produce a compound cream. Likewise, this affidavit did not support Insurer's contention to this Court that Nationally recognized schedules use "secret amorphous, and confusing criteria" to establish the AWP. Insurer Brief at 20.

It is axiomatic that factual statements in a brief that have no basis in the certified record cannot be considered by an appellate court. *Bingnear v. Workers' Compensation Appeal Board (City of Chester)*, 960 A.2d 890, 896 (Pa. Cmwlth. 2008). Under Pennsylvania Rule of Appellate Procedure 1951,[9] the record of

---

[8] At oral argument Pharmacy responded, *inter alia*, that "pills" cannot be used to manufacture a compounded medical cream.

[9] It states:

> (a) Composition of the record.--Where under the applicable law the questions raised by a petition for review may be determined by the court in whole or in part upon the record before the government unit, such record shall consist of:
>
>> (1) The order or other determination of the government unit sought to be reviewed.
>>
>> (2) The findings or report on which such order or other determination is based.
>>
>> (3) The pleadings, evidence and proceedings before the government unit.

9

determination of a government unit consists of the order sought to be reviewed, the findings or report on which the appeal is based, and the pleadings, evidence and proceedings before the government unit. This Court is confined to that record, and it will not consider extra-record facts or evidence. *Pryor v. Workers' Compensation Appeal Board (Colin Service Systems)*, 923 A.2d 1197, 1201 (Pa. Cmwlth. 2006). Accordingly, we will disregard Insurer's statements and claims about the average retail price for gabapentin and challenges to the value of Nationally recognized schedules of average wholesale prices.

Insurer's claim that the AWP is "fictitious" does not advance its position. Insurer seems to believe that the AWP must be the number used by a pharmaceutical company to set its wholesale price. However, any "average price" will be a number calculated from marketplace data, and that price may, or may not, actually be "used" by a vendor of merchandise. Truven Health Analytics acknowledges that its published Average Wholesale Price "does not reflect the *actual* AWP charged by *a wholesaler*." R.R. 39a (emphasis added).

In sum, Insurer did not meet its burden of proving that it properly reimbursed Pharmacy for the compounded medical cream it dispensed to treat Claimant's work injury. Accordingly, we affirm the Hearing Office's adjudication on this point.

## II.

Insurer next argues that the Bureau's regulation is incompatible with the plain meaning of Section 306(f.1)(3)(vi)(A) of the Act, which directs the use of the AWP to calculate reimbursement for a particular pharmaceutical product.

PA. R.A.P. 1951(a).

10

Insurer asserts that the Bureau's regulation exceeded this statutory directive because it authorizes the AWP to be based on data gathered and published by private organizations. Most recently, the Bureau identified "the *Red Book*, published by Truven Health Analytics," as its source for the AWP of pharmaceuticals. 47 Pa. B. 5740 (September 9, 2017). Insurer contends that this schedule does not reflect the "actual AWP" charged by pharmaceutical companies and, thus, it violates Section 306(f.1)(3)(vi)(A) of the Act to use this schedule. Insurer Brief at 10-11.

To begin, this argument of Insurer also lacks support in the record. As noted, the Leonard affidavit addressed only bupivacaine powder, and it did not offer any evidence on the "actual AWP" for any other ingredient in the compounded medical cream dispensed to Claimant. Accordingly, the Hearing Office found, as fact, that Insurer did "*not* rely upon the actual AWP in ascertaining the amount due" on Pharmacy's invoice. Adjudication at 5, F.F. No. 16, n.4; R.R. 103a (emphasis in original).

We turn, then, to Insurer's contention that the cost containment regulation does not conform to Section 306(f.1)(3)(vi) of the Act, which limits the reimbursement for prescription drugs to 110% of the AWP for the product. When enacted, Section 306(f.1)(3)(vi) stated as follows:

> The reimbursement for prescription drugs and professional pharmaceutical services shall *be limited to one hundred ten per centum of the average wholesale price of the product*.

*Former* 77 P.S. §531(3)(vi) (emphasis added). The General Assembly did not define the term "average wholesale price."

In *Commonwealth v. TAP Pharmaceutical Products, Inc.*, 36 A.3d 1112 (Pa. Cmwlth. 2011), *vacated on other grounds*, 94 A.3d 364 (Pa. 2014), this Court explained as follows:

Since the late 1960s, almost every branded prescription drug sold in the United States has an [AWP], which is published in commercial compendia like Red Book, First DataBank, and Medispan. During the period covered by this lawsuit, AWP is provided in a current, digital format for each available branded pharmaceutical, in each dosage and packaging size. The digital format and the constantly updated value are essential for use in computer-dominated reimbursement systems, such as those used by [the Department of Human Services and Department of Aging]….

*Id.* at 1130. While critical of the AWP-based system for drug reimbursement, this Court explained that the AWP provided an efficient estimate of acquisition costs for pharmaceuticals. Further, this Court observed:

The reference to published prices was not intended to modify the accuracy of the average price phrase; rather, the reference to published prices was intended to establish a widely-available third-party source of average prices. Establishing such a source relieves the [Department of Human Services and Department of Aging] of legal mandates to ascertain, by alternative methods, estimated acquisition costs…. In short, the reference to published prices does not change the plain meaning of the cost to be ascertained.

*Id.* at 1161 (citing *Commonwealth v. TAP Pharmaceutical Products, Inc.* (Pa. Cmwlth., No. 212 M.D. 2004, filed October 14, 2010) (single-judge op.) (Simpson, J.), slip op. at 8) (citation omitted). In short, the AWP provides an objective estimate of acquisition costs for pharmaceuticals available through national pricing schedules.

In 2014, after the extensive *TAP* litigation, the General Assembly amended Section 306(f.1)(3)(vi) of the Act. *See* Act of October 27, 2014, P.L. 2894, No. 184. The amendment did not define the term "average wholesale price." It did, however, add a phrase so that Section 306(f.1)(3)(vi)(A) now reads as follows:

12

The reimbursement for drugs and professional pharmaceutical services shall be limited to one hundred ten per centum of the average wholesale price (AWP) of the product, *calculated on a per unit basis, as of the date of dispensing*.

77 P.S. §531(3)(vi)(A) (emphasis added to identify new language). The parties addressed the 2014 amendment in their supplemental briefs.

Insurer explains that the 2014 amendment did not change the meaning of "average wholesale price (AWP) of the product" in Section 306(f.1)(3)(vi)(A) of the Act. The language specifying that the AWP must be "calculated on a per unit basis, as of the date of dispensing" simply clarified the application of the AWP methodology. Specifically, the amendment requires that the AWP be calculated on the date dispensed and that the employer is only responsible for the cost of the units dispensed, as opposed to the whole package. Insurer Supplemental Brief at 15-16. Pharmacy agrees.

Insurer then argues that pharmaceutical industry compendia, such as Truven Health Analytics' Red Book, do not report the actual wholesale price of pharmaceuticals. Asserting that "there is no readily available resource from which to get the [actual] AWPs," Insurer urges that the "best proxy that can be used is the average retail price." Insurer Brief at 38. We reject this contention.

The legislature could have amended Section 306(f.1)(3)(vi)(A) to define "average wholesale price" to mean "average retail price," as suggested by Insurer. It did not do so.

The concurring and dissenting opinion of Judge Ceisler agrees with Insurer's "persuasive statutory construction argument that the AWP" denotes the "*actual* average wholesale price, *not* a fictitious AWP." *Indemnity Insurance Company of North America v. Bureau of Workers' Compensation Fee Review*

13

*Hearing Office (Insight Pharmacy)*, __ A.3d __, __ (Pa. Cmwlth., No. 696 C.D. 2018, filed January 5, 2021) (Ceisler J., concurring & dissenting), slip op. at 1 (emphasis in original). In support, Judge Ceisler relies upon federal court decisions as well as an October 18, 2013, sponsoring memorandum of Representative Marguerite Quinn. The majority agrees with Judge Ceisler that our task is to construe "AWP" according to its plain meaning. The majority opinion does just that.

First, the legislature dictated the use of the industry AWP, not the AWP charged by a single manufacturer. The AWP is a number derived by averaging the wholesale prices of all manufacturers or wholesalers. The *TAP* litigation developed the "fictitious" moniker for "AWP." Other than conveying a derogatory connotation, this adjective has little meaning. A number calculated from data collected from the market place is neither "fictitious" nor "actual." The number is either accurate or inaccurate, but it has no "actual" existence.

In any case, Insurer asserts that it is the average retail price that should be the measure used in any pharmaceutical reimbursement system. To read "average wholesale price" to mean "actual retail price" does violence to the words used by the legislature. Insurer needs to make its case to the General Assembly and seek an amendment to Section 306(f.1)(3)(vi)(A) before the industry average retail price can become the appropriate standard for use in a system of pharmaceutical reimbursement.

Second, the sponsoring memorandum of Representative Quinn does not advance Insurer's assertion that AWP means a number derived from retail prices. The memorandum advises that Representative Quinn intends, at some time, to introduce legislation to "decrease costs in the workers' compensation system," but that legislation is not identified either by bill number or printer's number. Insurer

14

Supplemental Brief, Appendix. Stated otherwise, there is no way to connect this memorandum to the 2014 amendment.

Even assuming the amendment initiated by Representative Quinn does relate to Section 306(f.1)(3)(vi)(A) of the Act, the statement of a single legislator is not entitled any weight. The General Assembly has circumscribed the use of comments and reports in statutory construction. Section 1939 of the Statutory Construction Act of 1972 states as follows:

> The comments or report of the commission, committee, association or other entity which drafted a statute may be consulted in the construction or application of the original provision of the statute if such comments or report were published or otherwise generally available prior to the consideration of the statute by the General Assembly, but the text of the statute shall control in the event of conflict between its text and such comments or report.

1 Pa. C.S. §1939. The "remarks and understanding of individual legislators are not relevant in ascertaining the meaning of a statute," *McCormick v. Columbus Conveyor Company*, 564 A.2d 9077, 910 n.1 (Pa. 1989), and the "records of individual legislators in debate are not relevant for the obvious reason that they represent only one person's view and not that of the opposing or enacting body." *Zemprell v. Thornburgh*, 407 A.2d 102, 109 (Pa. Cmwlth. 1979).

In short, in its plain meaning, Section 306(f.1)(3)(vi)(A) requires the use of "average wholesale price" and not "average retail price." Insurer could have produced evidence to support a calculation of an AWP more accurate than the one authorized by the regulation and listed by the Bureau in the *Pennsylvania Bulletin*. Instead, Insurer offered a conclusory affidavit laden with simple math errors as the sum total of its evidence.

15

The regulation authorizes the Bureau to use an AWP produced by a Nationally recognized pricing schedule for "resolving payment disputes." 34 Pa. Code §127.131. It does not mandate the use of a particular Nationally recognized pricing schedule. To the contrary, an insurer and a provider may agree on which "Nationally recognized" schedule to use, and it need not be the one published by the Bureau each year in the *Pennsylvania Bulletin.* 34 Pa. Code §127.131.

Likewise, the regulation does not prevent a provider or employer from proposing a Nationally recognized schedule other than the one listed by the Bureau in the *Pennsylvania Bulletin* when litigating a repricing dispute before the Medical Fee Review Section or the Hearing Office. Insurer was free to offer evidence of another source of data to establish the AWP for each of the ingredients used in the compounded medical cream that would have allowed the fact finder to reprice Pharmacy's invoice to a different result. However, Insurer did not present any evidence relevant to the "actual" AWP of the ingredients that Pharmacy used to produce the compounded medical cream dispensed to Claimant.

Insurer's challenge to the regulation lacks merit.

## III.

In its third issue, Insurer asserts that the Bureau's regulation improperly connects the amount of medical compensation owed to an AWP set by private companies. Insurer argues that the regulation has delegated legislative authority to private persons, in violation of Article II, Section 1 of the Pennsylvania Constitution.[10] In support of its argument, Insurer directs the Court to *Protz v.*

---

[10] Article II, Section 1 of the Pennsylvania Constitution states that "[t]he legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives." PA. CONST. art. II, §1.

16

*Workers' Compensation Appeal Board (Derry Area School District)*, 161 A.3d 827 (Pa. 2017).

The regulation does not specify Truven Health Analytics. Rather, the regulation allows the Bureau to use, in a limited way, information from a Nationally recognized schedule of prices compiled from the marketplace. The regulation does not preclude an employer from offering another Nationally recognized schedule or some other source of price data, such as an internationally recognized schedule, to establish the AWP for pharmaceuticals dispensed to workers' compensation claimants. Insurer made no attempt to establish the so-called "actual" AWP with evidence. It was not prevented by the regulation to make a case for the use of an "actual" AWP to reprice Pharmacy's invoice. Simply, Insurer lacks any basis for its constitutional claim.

**Conclusion**

Insurer had the burden of proving that its reimbursement of $305.92 to Pharmacy for the compounded medical cream dispensed to Claimant satisfied Section 306(f.1)(3)(vi)(A) of the Act. It did not come close. For the reasons set forth above, we discern no error in the Hearing Office's adjudication that Insurer owed Pharmacy $6,336.02, plus interest, for the prescription. Accordingly, we affirm the Hearing Office's adjudication.

_____
MARY HANNAH LEAVITT, President Judge

17

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Indemnity Insurance Company of North America, : : : : Petitioner : : : v. : No. 696 C.D. 2018 : Bureau of Workers' Compensation Fee : Review Hearing Office (Insight : Pharmacy), : : Respondent :

# **O R D E R**

AND NOW, this 5th day of January, 2021, the adjudication of the Bureau of Workers' Compensation Fee Review Hearing Office dated April 24, 2018, in the above-captioned matter is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Indemnity Insurance Company of :
North America, :
               Petitioner :
                :
                :
        v. : No. 696 C.D. 2018
                : ARGUED: June 10, 2020
Bureau of Workers' Compensation :
Fee Review Hearing Office (Insight :
Pharmacy), :
             Respondent :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE J. ANDREW CROMPTON, Judge

CONCURRING AND DISSENTING
OPINION BY JUDGE CEISLER                FILED: January 5, 2021

I agree with the majority's conclusion that Petitioner, Indemnity Insurance Company of North America (Insurer) failed to meet its burden of proving that it reimbursed Insight Pharmacy (Pharmacy) correctly for the prescribed pain cream, and therefore, that the Hearing Officer's decision should be affirmed. I write separately, however, to stress a critical distinction between the actual and fictitious average wholesale price (AWP), which I believe must be acknowledged. Insurer presents a persuasive statutory construction argument that the AWP, for purposes of pharmaceutical reimbursements under the Workers' Compensation (WC) Act,[1] is the ***actual*** average wholesale price, ***not*** a fictitious AWP.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.1, 2501-2710.

### 1. Insurer's Initial Argument

In 1993, in response to spiraling medical expenses leading to a proposed 52% hike in insurance premiums, the General Assembly enacted the Act of July 2, 1993, P.L. 190, No. 44, commonly known as Act 44 (1993 WC Amendment), which amended the WC Act by adding cost containment provisions, such as Section 306(f.1)(3)(vi)(A) of the WC Act, 77 P.S. §531(3)(vi)(A), governing reimbursement for prescription drugs based on 110% of the AWP. However, the 1993 WC Amendment did not define AWP.

Section 127.131 of the Workers' Compensation Medical Cost Containment Regulations, 34 Pa. Code §127.131 (relating to payment for prescription drugs and pharmaceuticals), promulgated under the cost containment provisions in the 1993 WC Amendment, provided the Workers' Compensation Bureau (Bureau) with the option of choosing any of three nationally recognized schedules to determine AWP. Insurer contends the General Assembly dictated that AWP be used as a benchmark for drug pricing. However, *the Bureau, not the General Assembly,* determined that AWP was obtainable from any one of the three nationally recognized schedules and elected to use data from the Truven Red Book.

Insurer argues that the three national schedules do not report the *actual* AWPs. Rather, they have developed entirely fictitious AWPs. For example, Insurer asserts that Gabapentin, one of the compounds in the compounded cream at issue here, has an average retail price of $35 for a bottle of 90 pills. *See* Pet'r's Br. at 36-37. However, Insurer claims the same quantity of the drug has a fictitious AWP of $140 per bottle. Therefore, the workers' compensation reimbursement, 110% of the fictitious AWP for Gabapentin, would be $154 for a bottle of 90 pills; yet the retail

EC - 2

price for the same amount of Gabapentin is only $35 per bottle.[2]  *Accord In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp.2d 20, 40-41 (D. Mass. 2007), *aff'd*, 582 F.3d 156 (1st Cir. 2009), *cert. dismissed sub nom. AstraZeneca Pharms. LP v. Blue Cross Blue Shield of Mass.*, 561 U.S. 1056 (2010) (*MDL 2007*) (explaining how the gap between the true price for acquisition and the reported AWPs ballooned; some actual AWPs were 60% to 90% below the reported AWPs). Insurer argues that switching from the fictitious AWP to the originally intended ***actual*** AWP could save Pennsylvania employers and insurance carriers hundreds of millions of dollars in unnecessary spending on pharmaceuticals.

### 2.    Statutory Construction

The WC Act has never defined the term "average wholesale price."  However, the Act of October 27, 2014, P.L. 2894, No. 184 (2014 WC Amendment), now provides for reimbursement for pharmaceutical goods and services at 110% of the AWP, "calculated on a per unit basis, as of the date of dispensing."  77 P.S. § 531. Insurer contends that in light of this Court's decision in *Commonwealth v. TAP Pharmaceutical Products, Inc.*, 36 A.3d 1112 (Pa. Cmwlth. 2011), *vacated on other grounds*, 94 A.3d 364 (Pa. 2014), and the addition of the above language to 77 P.S. §531, the legislature intended "average wholesale price" to mean the ***actual*** AWP.

Insurer's supplemental brief addresses this issue in comprehensive and persuasive detail.  Insurer asserts that by offering no changes to the meaning of the

---

[2] Insurer asserts there is no readily available resource to determine the actual AWP for the ingredients in the compounded cream at issue, and therefore, the best proxy that can be used is the average retail price.  Insurer suggests that although the retail price would obviously be higher than the actual AWP, it would still be more reasonable than the grossly inflated fictitious AWP.  There is persuasive logical appeal in Insurer's reasoning that where the actual retail price is substantially less than the purported AWP, the AWP must be incorrect, and thus, fictitious.  However, I agree with the majority that Insurer cites no authority from the record or otherwise in support of its argument concerning the amounts of the specific retail and wholesale prices it posits.

AWP, the 2014 WC Amendment demonstrates legislative approval for the courts' prior plain language reading of the term.

### a. Legislative History

The 1993 WC Amendment added medical cost-containment provisions to the WC Act. These provisions were modeled after the Medicare system. In enacting the 1993 WC Amendment, the legislature provided no definition for the term "average wholesale price."

About six months earlier, Pennsylvania had enacted the Act of December 18, 1992, P.L. 792, No. 128 (1992 Preservation Act Amendment), amending the Lottery Fund Preservation Act[3] to include provisions providing pharmaceutical assistance for the elderly and requiring the Department of Aging to reimburse medical providers for prescription drugs based on "average wholesale cost." *Former* 72 P.S. § 3762-303(H)(12)(i). Like the 1993 WC Amendment, the 1992 Preservation Act Amendment provided no definition of "average wholesale cost."

Four years later, in 1996, Pennsylvania enacted Act 134 of 1996 (1996 Lottery Law Amendment),[4] repealing the Lottery Fund Preservation Act and adding Section 502 to Pennsylvania's State Lottery Law (Lottery Law),[5] defining AWP as "average wholesale cost," which is "[t]he cost of a dispensed drug based upon the price published in a national drug pricing system in current use by the Department of Aging as the [AWP] of a prescription drug in the most common package size." 72 P.S. § 3761-502. The 1996 Lottery Law Amendment remained in place for many

---

[3] Act of August 14, 1991, P.L. 342, No. 36, *former* 72 P.S. §§ 3761-101 – 3762-904.

[4] Act of November 21, 1996, P.L. 741, No. 134.

[5] Act of August 26, 1971, P.L. 351, *as amended*, 72 P.S. §§ 3761-101 – 3761-2103.

years without any substantive changes.[6] By contrast, the legislature never amended the WC Act to provide a definition of the AWP.

### b. Federal Multidistrict AWP Litigation

Artificial inflation of fictitious AWPs regarding Medicare reimbursements gave rise to federal multidistrict litigation alleging fraudulent inflation of the costs of pharmaceutical drugs. In *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 460 F. Supp.2d 277, 287 (D. Mass. 2006) (*MDL 2006*), a federal judge in the multidistrict litigation concluded that ***the AWP was not an industry term of art, but rather must be accorded its plain meaning***.

### c. Pennsylvania AWP Litigation – *TAP*

In 2004, in *TAP*, the Commonwealth of Pennsylvania similarly filed a complaint against numerous pharmaceutical companies, alleging fraudulent manipulation of AWPs[7] with regard to prescription cost reimbursements by the Department of Aging. The 1996 Lottery Law Amendment required the Department of Aging to reimburse for pharmaceuticals using the AWP "based upon the price published in a national drug pricing system in current use by the Department of Aging." 72 P.S. § 3761-502. The defendants in *TAP* argued that this reference to national price compendia showed a different legislative intent from that of the Medicare statutes in the federal litigation. This Court rejected that argument:

> Defendants' [argument] "appears to boil down to the remarkable proposition that the Legislature delegated responsibility for . . . drug reimbursement to the pharmaceutical industry, and that drug

---

[6] However, the Act of July 10, 2006, P.L. 1061, amended the Lottery Law to reduce the payment rate from 90% to 88% of the "average wholesale cost." *See* 72 P.S. §§ 3761-509 – 3761-510.

[7] The Commonwealth filed an Amended Complaint in 2005. *See Commonwealth ex rel. Pappert v. TAP Pharm. Prods., Inc.*, 885 A.2d 1127, 1131 (Pa. Cmwlth. 2005).

manufacturers were thereafter free to report whatever prices and obtain whatever level of reimbursement they desired." [(Citation omitted).] Clearly, this would lead to an absurd result, and would favor a private, rather than public interest, which we must presume the Legislature did not intend. 1 Pa. C.S. §1922(1), (5). It is also noteworthy that there is no known judicial acceptance of this position.

*TAP*, 36 A.3d at 1194, App. B. Thus, like the federal court in *MDL* 2006, this Court held that the AWP must be interpreted according to its plain meaning, concluding that "those writing Pennsylvania's reimbursement laws sought a formula to give an easily-ascertained, objective, accurate estimate of acquisition costs for pharmaceuticals, ***not a fictitious value allowing reimbursement unrelated to prices actually paid by providers***." *Id.* at 1194-95 (emphasis added). Therefore, the legislature "intended the phrase 'average wholesale price' to mean what it plainly says, that is, ***an average of wholesale prices paid by providers***." *Id.* (emphasis added).

In short, both the federal court in *MDL 2006* and this Court in *TAP* found ***the term "average wholesale price," in relation to reimbursement of prescription costs, must be interpreted according to its plain meaning***.

### d. 2014 WC Amendment

#### i. Added Language

Relevant here, the 2014 WC Amendment added 12 words to the end of the sentence in the WC Act which mandates the AWP standard: "The reimbursement for [prescription] drugs and professional pharmaceutical services shall be limited to one hundred ten per centum of the average wholesale price (AWP) of the product, ***calculated on a per unit basis, as of the date of dispensing***." 77 P.S. §531(3)(vi)(A) (emphasis added). These 12 words clarified how the AWP standard was applied, ***not*** how AWP is defined.

### ii.     Legislative Intent

The 2014 WC Amendment revised Section 306(f.1)(3)(vi) of the WC Act in order to reduce pharmaceutical costs and limit physician self-dispensing.  *See, e.g.*, Section 306(f.1)(3)(vi)(H) of the WC Act, 77 P.S. § 531(3)(vi)(H) ("The Workers' Compensation Advisory Council shall annually conduct a study of the impact of this sub-clause, ***including calculation of the savings achieved in the dispensing of pharmaceuticals***"); H.B. 1846 § 1.1, Reg. Sess. (Pa. 2013) (requiring the Pennsylvania Compensation Rating Bureau to calculate the savings achieved through the implementation of the amendment of Section 306(f.1)(3)(vi); "***the amount of the savings shall be used to provide an immediate reduction in rates, equal to the savings, applicable to employers' workers' compensation policies***") (emphasis added).

One cost problem identified by the drafters of the 2014 WC Amendment involved healthcare providers that were relying on National Drug Code (NDC) numbers from repackaged drugs that were purchased in bulk and then sold to physicians in smaller lots at much higher prices.  This led to an "artificial and inflated AWP of repacked drugs" (10/18/13 Pennsylvania House of Representatives Memo, attached in Appendix to Insurer's supplemental brief).

To achieve the goal of lower pharmaceutical costs, the 2014 WC Amendment sought to (1) end the practice of pharmaceutical billing based on inflated NDCs provided by drug re-packagers (as opposed to the original manufacturer's NDCs) and (2) strictly limit the practice of physicians self-dispensing pharmaceuticals.  A Pennsylvania House of Representatives Memorandum circulated by the 2014 WC Amendment's sponsor, Representative Marguerite Quinn, spelled out the amendment's objectives:

- Require physicians to include the original drug manufacturer's NDC submissions for reimbursement;

- Establish a maximum reimbursement rate of 110% for physician-dispensed drugs;

- Prohibit the use of repackaged NDC numbers;

- Limit physician dispensing to drugs needed in the first five days following initial treatment;

- Ultimately decrease costs in the workers' compensation system without sacrificing the quality of healthcare services received by patients.

*Id.*

This was not the only clarification the legislature provided for applying the AWP standard. Under the prior law, healthcare providers seeking to maximize profit could argue for AWP based on a per package calculation as opposed to a per unit calculation. The healthcare provider would then bill for a whole bottle of pills as opposed to the one or two pills actually dispensed.[8] The 2014 WC Amendment's clarification that AWP must be recorded on a "per unit basis" addressed this issue and also financially enforced the restrictions on physician dispensing.[9]

Thus, the 2014 WC Amendment provided no change to the statutory meaning of the AWP, but merely clarified when and in what increments the standard of the

---

[8] In fact, the State Lottery Law requires the Pennsylvania Department of Aging to reimburse prescription drugs based upon the "average wholesale price of a prescription drug in *the most common package size*." 72 P.S. § 3761-502 (emphasis added).

[9] The 2014 WC Amendment's limits on physician dispensing allow physicians to seek reimbursement only for a seven-day supply of certain controlled substances such as those containing hydrocodone. Determining the AWP based upon a per unit basis, as opposed to a per package basis, precludes an end run around this prohibition.

AWP should be applied. In clarifying when AWP is measured and whether it is recorded for individual units or an entire package, the legislature did nothing to change the underlying meaning of the "average wholesale price." The amendment's added language reflected these concerns by requiring the AWP to be "***calculated on a per unit basis, as of the date of dispensing***." 77 P.S. §531(3)(vi)(A) (emphasis added). The legislature did not intend in any way to deviate from the plain meaning of "average wholesale price."

### iii. Presumption of Legislative Concurrence

"The failure of the General Assembly to change the law which has been interpreted by the courts creates a presumption that the interpretation was in accordance with the legislative intent; otherwise the General Assembly would have changed the law in a subsequent amendment." *Fonner v. Shandon, Inc.*, 724 A.2d 903, 906 (Pa. 1999); *see Fletcher v. Pa. Prop. & Cas. Ins. Guar. Ass'n*, 985 A.2d 678 (Pa. 2009). Thus, the legislature's decision not to amend the plain meaning of AWP via the 2014 WC Amendment must be understood in the context of its timing.

In October 2013, Representative Marguerite Quinn circulated a memorandum to the Pennsylvania House of Representatives, announcing legislation addressing physician self-dispensing. Before her bill was even introduced, the federal ruling in the multidistrict litigation held that the term "average wholesale price" in the Medicare statute **on which the legislature relied in drafting the 1993 WC Amendment**[10] must be understood according to its plain meaning. *MDL 2006*, 460 F. Supp.2d at 284. Likewise, three years before the 2014 WC Amendment was introduced, this Court held in *TAP* that the legislature intended "average wholesale price" to be given its plain meaning. *TAP*, 36 A.3d at 1194-95.

---

[10] Notably, like the Medicare statutes, the WC Act contains no reference to national price compendia.

If the legislature disagreed with the plain meaning of the term as endorsed by the Courts, it was free to amend the Act accordingly. It did not do so. Therefore, there is a presumption that the Courts' interpretation of the plain meaning of AWP was in accord with legislative intent. *Fletcher*; *Fonner*.

### 3. Conclusion

I agree with Insurer's persuasive statutory construction argument. The AWP, for purposes of pharmaceutical reimbursements under the WC Act, is the ***actual*** average wholesale price, "calculated on a per unit basis, as of the date of dispensing," 77 P.S. § 531, ***not*** a fictitious AWP.

Nonetheless, I agree with the majority that in this particular case, Insurer must reimburse Pharmacy as determined by the Hearing Office, because Insurer did not sustain its burden of proving it properly reimbursed Pharmacy. Insurer failed to present evidence of the ***actual*** AWP[11] of any of the ingredients in the compounded cream, miscalculated the amount due on the one ingredient it paid for, offered no evidence of ***any*** AWP for five of the six ingredients, and offered no evidence of ***any*** payment for five of the six ingredients.

Accordingly, I concur in the outcome but respectfully dissent from the majority's statutory analysis.

_____
ELLEN CEISLER, Judge

Judge McCullough joins in this Concurring and Dissenting Opinion.

---

[11] As a practical matter, one effect of this decision may be that pharmacies will have to provide documentation of their ***actual*** AWP, in light of the added calculation limitations in order to establish an amount that is 110% of the AWP and obtain reimbursement. The Bureau may, and should, clarify that requirement by regulation. Arguably, therefore, the added language concerning calculation of the AWP should solve Insurer's alleged difficulty in obtaining ***actual*** AWPs in the future.